J-A22034-16

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN RE: E.S. | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| | : | |
| APPEAL OF: E.S. | : | No. 6 MDA 2016 |

Appeal from the Order Entered November 23, 2015
In the Court of Common Pleas of Berks County
Civil Division at No(s): 199-15MH

BEFORE:  GANTMAN, P.J., PANELLA, J., and JENKINS, J.

MEMORANDUM BY GANTMAN, P.J.:                **FILED NOVEMBER 15, 2016**

Appellant, E.S., appeals from the order entered in the Berks County Court of Common Pleas, which granted in part and denied in part Appellant's petition to expunge the record of his involuntary commitment under the Mental Health Procedures Act ("MHPA")[1] or, in the alternative, relieve his firearms disabilities under the Pennsylvania Uniform Firearms Act ("UFA").[2] We affirm.

The trial court opinion fully sets forth the relevant facts and procedural history of this case.  Therefore, we have no reason to restate them.[3]

Appellant raises the following issues for our review:

> WHETHER THE TRIAL COURT ABUSED ITS DISCRETION,

---

[1] 50 P.S. §§ 7101-7503.

[2] 18 Pa.C.S.A. §§ 6101-6127.

[3] The order under review was dated November 20, 2015, but entered on November **23**, 2015.

COMMITTED ERROR OF LAW, OR VIOLATED CONSTITUTIONAL RIGHTS OF APPELLANT BY PLACING THE BURDEN ON…APPELLANT IN RELATION TO HIS CHALLENGES PURSUANT TO 18 PA.C.S. § 6111.1(G)(2), WHEN AS RECENTLY HELD BY THIS COURT IN *IN RE VENCIL*, 120 A.3D [1028 (PA.SUPER. 2015)], *DE NOVO* REVIEW IS REQUIRED, UNDER A CHALLENGE PURSUANT TO 18 PA.C.S. § 6111.1(G)(2), WHERE…APPELLEES BEAR THE BURDEN OF ESTABLISHING THE SUFFICIENCY UNDER A "CLEAR AND CONVINCING" EVIDENTIARY STANDARD OF PROOF, AS THERE IS NO OTHER STATUTORY MECHANISM TO CHALLENGE THE SUFFICIENCY AND VALIDITY OF A 50 P.S. § 7302 COMMITMENT, UNLIKE A 50 P.S. § 7303 COMMITMENT.

WHETHER THE COURT ABUSED ITS DISCRETION, COMMITTED ERROR OF LAW, OR VIOLATED CONSTITUTIONAL RIGHTS OF APPELLANT BY DENYING…APPELLANT'S CHALLENGE TO THE SUFFICIENCY OF THE COMMITMENT, PURSUANT TO 18 PA.C.S. § 6111.1(G)(2), WHEN THE RECORD IS DEVOID OF ANY EVIDENCE ESTABLISHING…APPELLEES' COMPLIANCE WITH THE STATUTORY AND REGULATORY REQUIREMENTS FOR AN INVOLUNTARY CIVIL COMMITMENT, PURSUANT TO THE MENTAL HEALTH AND PROCEDURES ACT, 50 P.S. § 7101, *ET SEQ.*, AND ITS IMPLEMENTING REGULATIONS, 55 PA.CODE 5100.1, *ET SEQ.*, AND WHERE, TO THE CONTRARY, THE RECORD ESTABLISHES THAT:

A. [A]PPELLANT WAS NEVER EXAMINED WITHIN TWO (2) HOURS OF HIS ARRIVAL, AS REQUIRED BY 50 P.S. § 7302 AND EXPLICITLY EVIDENCED BY THE CONTROLLING DOCUMENT, SECTION VI OF THE 302 PETITION;

B. [A]PPELLANT WAS NEVER ADVISED OF HIS RIGHT TO COUNSEL NOR PROVIDED COUNSEL, PURSUANT TO 55 PA.CODE §§ 5100.86(E), (J)(3); AND,

C. [A]PPELLANT WAS NEVER PROVIDED FORMS MH-782, MH-783A, OR MH-783B, OR ANYTHING SUBSTANTIALLY SIMILAR, AS REQUIRED BY 5[5] PA.CODE §§ 5100.86(E), (G), (J).

WHETHER THE COURT ABUSED ITS DISCRETION, COMMITTED ERROR OF LAW, OR VIOLATED CONSTITUTIONAL RIGHTS OF APPELLANT BY DENYING…APPELLANT'S REQUEST TO VACATE AND/OR EXPUNGE HIS MENTAL HEALTH COMMITMENT CONTRARY TO ESTABLISHED LAW INCLUDING **WOLFE V. BEAL**, 384 A.2D 1187 (PA. 1978), **IN RE VENCIL**, 120 A.3D 1028 (PA.SUPER. 2015), **IN RE RYAN**, 784 A.2D 807 [(PA.SUPER. 2001)], AND **BENN V. UNIVERSAL HEALTH SYSTEM, INC.**, 371 F.3D 165 (3D CIR. 2004) WHEN THE RECORD IS DEVOID OF ANY EVIDENCE, AS SET FORTH IN ISSUE 2, **SUPRA**, THAT APPELLANT WAS (1) EXAMINED WITHIN TWO HOURS OF HIS ARRIVAL AT THE FACILITY, (2) ADVISED OF HIS RIGHT TO COUNSEL OR PROVIDED COUNSEL, (3) WAS PROVIDED THE REQUISITE FORMS— MH-782, MH-783A, OR MH-783B AND WHERE, IN THE ABSENCE OF ANY SUCH EVIDENCE, …APPELLANT'S COMMITMENT HAS TARNISHED HIS REPUTATION AND HAS PUTATIVELY RESTRICTED HIS FIREARMS RIGHTS FOR THE REMAINDER OF HIS NATURAL LIFE.

(Appellant's Brief at 3-5).

This Court reviews the denial of a petition to expunge a record of an involuntary mental health commitment for an abuse of discretion. **In re Keyes**, 83 A.3d 1016 (Pa.Super. 2013), *appeal denied*, 627 Pa. 766, 101 A.3d 104 (2014). After a thorough review of the record, the briefs of the parties, the applicable law, and the well-reasoned opinion of the Honorable Madelyn S. Fudeman, we conclude Appellant's issues merit no relief. The trial court opinion comprehensively discusses and properly disposes of the questions presented. (**See** Trial Court Opinion, filed March 23, 2016, at 10-17) (finding: court conducted *de novo* review; Appellant's involuntary commitment complied with applicable laws; MHPA and interpretive case law

- 3 -

are unclear which party bears burden of proving sufficiency of evidence for involuntary commitment where petition to expunge is filed; regardless, Appellees clearly established sufficiency of evidence for Appellant's involuntary commitment under standard of clear and convincing evidence; 50 P.S. § 7302(b) requires examination by physician within two hours of individual's arrival at facility, but does not require physician's final commitment determination within same two-hour period; records show that when Appellant arrived at hospital, he was "combative" to extent that restraint order was needed; Appellant was assessed as refusing treatment and exhibiting violent/aggressive behavior toward staff, other patients, or himself; records show Dr. Sigal initiated examination of Appellant at 3:15 p.m., well within two hours of his arrival at hospital; evidence established that course of assessment, observation, and treatment was immediately and continuously provided from time of Appellant's arrival; less than one hour after Appellant arrived, Dr. Sigal examined Appellant and ordered several tests as well as medications to control Appellant's psychosis; Appellant continued to receive extensive observation and testing until Dr. Gordon examined Appellant and signed Section 302 petition at 12:10 a.m.; Appellant's commitment complied with time requirements of MHPA; court did not credit Appellant's or Appellant's mother's testimony that they did not receive Forms MH-782 ("Bill of Rights"), MH-783-A ("Explanation of Rights Under Involuntary Emergency Commitment"), or MH-783-B ("Explanation of

Warrant"); Part IV of Section 302 petition contained clear affirmation that rights described in Form MH-783-A were read to Appellant, and Appellant did not understand those rights (which was unsurprising in light of his mental condition at that time); form MH-783-A referred to attached form MH-782, which explained Appellant's right to counsel; Appellant's mother executed Section 302 petition, indicating Mother received and understood relevant paperwork; evidence shows forms were provided; no evidence shows Appellant or Mother requested counsel; Appellant's involuntary commitment complied with relevant statutes and regulations).[4]  Accordingly, we affirm on the basis of the trial court opinion.

Order affirmed.

---

[4] In issue three of his statement of questions involved, Appellant complains of damage to his reputation and restriction of his firearm rights.  Appellant, however, failed to develop any argument on those points.  Therefore, these claims are waived.  **See Commonwealth v. Beshore**, 916 A.2d 1128 (Pa.Super. 2007), *appeal denied*, 603 Pa. 679, 982 A.2d 509 (2007) (*en banc*) (stating failure to develop adequate argument in appellate brief may result in waiver of claim).  Moreover, the court's November 23, 2015 order relieved Appellant of his firearms disabilities under the UFA.  Appellant also argues for the first time in his reply brief that Dr. Sigal and Dr. Gordon were not "physicians" within the meaning of the MHPA.  That claim is waived because Appellant failed to raise it before the trial court and in his initial brief.  **See** Pa.R.A.P. 302(a) (stating issues not raised in trial court are waived and cannot be raised for first time on appeal); **Commonwealth v. Wharton**, 571 Pa. 85, 811 A.2d 978 (2002) (stating reply brief is inappropriate means to present new issues and substantively different from those addressed in original brief).

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 11/15/2016

IN RE: E.S.                                              : IN THE COURT OF COMMON PLEAS
                                                        : OF BERKS COUNTY, PENNSYLVANIA

                                                        : CIVIL ACTION - LAW

                                                        : NO: 199-15 MH

                                                        : 6 MDA 2016

Joshua Prince, Esq., Attorney for Appellant E.S.
Andrew Lovette, Esq., Attorney for Appellee, the Pennsylvania State Police
Darlene King, Esq., Attorney for Appellee, Reading Hospital and Medical Center

**Opinion, Madelyn S. Fudeman, J.**                                    **March 23, 2016**

This is an appeal from this Court's Order dated November 20, 2015, and docketed

November 23, 2015, which denied Appellant's request to vacate and expunge his mental health

commitment.

Appellant's Petition to Vacate and Expunge Involuntary Civil Commitment was filed on

June 1, 2015. A hearing was held on July 21, 2015, and continued for supplemental testimony on

September 2, 2015. This Court then directed Appellant to file a brief in support of the petition

within fifteen (15) days, and Respondents to file responsive briefs fifteen (15) days thereafter.

Appellant timely filed his brief in support on September 8, 2015. Appellee Reading Hospital and

Medical Center ("Reading Hospital") timely filed its responsive brief on September 23, 2015.

Appellee Pennsylvania State Police ("PSP") filed its responsive brief on November 6, 2015.

Upon consideration of testimony, evidence, argument, and briefs filed, this Court entered

an Order on November 20, 2015, which granted Appellant's request for state firearms relief

under 18 Pa.C.S. § 6105(f), but denied Appellant's request for vacation and expungement under

1

18 Pa. C.S. § 6111.1(g)(2). Appellant filed a Motion for Reconsideration on December 9, 2015 which was denied by this Court on December 16, 2015. On December 21, 2015, Appellant timely filed an appeal.

## FACTS

In October, 2004, E. S. ("Appellant") was home from college living at his Mother's ("Mother") house. (Notes of Testimony of Sept. 2, 2015, hearing ("N.T."), 60). Appellant was twenty-two (22) years old at the time. (N.T. 79). Appellant had been dealing with stressful events including interviewing for jobs and breaking up with his girlfriend. (N.T. 60, 80). In or about mid-October, 2004, Appellant ordered and started taking the supplement Huperzine A because he was having trouble focusing. (N.T. 80). After beginning taking the supplement, Appellant began to experience OCD, trouble sleeping, visual and auditory hallucinations and loss of appetite. He exhibited poor personal hygiene and delusional thinking, expressing his belief that he created electricity and could control the weather and the planets. (N.T. 61, 75, 81).

According to Mother's testimony, on October 31, 2004, Appellant who had been behaving strangely for days made breakfast and cleaned up, he then went up to his room, came back down, started talking about being able to control electricity, and suddenly began convulsing and fell to the floor. (N.T. 61-62, 72). Mother did not know what was wrong with Appellant. Somewhat inexplicably, her first call was to her mother-in-law. (N.T. 61-62). Before calling 911, Mother's mother-in-law recommended calling someone in the mental health profession, and Mother thought that was the right thing to do. (N.T. 71-73). Mother testified that she initially called Reading Hospital, and she was directed to contact the Mental Health department. (N.T.

2

62). Appellant's mother-in-law came over, and they together made the decision to call 911, and an ambulance arrived. (N.T. 62). Appellant did not respond to the ambulance personnel or go easily to the ambulance, saying he did not need to go. (N.T. 62). Mother testified that she knew at that time that Appellant needed to be seen by "somebody" and signed "forms" before Appellant was placed in the ambulance. (N.T. 62-63). [1]

Appellant was then taken to the emergency room of Reading Hospital, and arrived at approximately 2:34 p.m. on October 31, 2004. (N.T. 63, Exhibit 1, page 1). A restraint order was signed by Dr. Adam Sigal at 2:34 p.m. that indicated violent/aggressive behavior toward staff, other patients, or self; verbal or physical threats of harm to staff, other patients, or self; and risk of elopement. (Exhibit 1, page 41). The restraint order also indicated that the Appellant required "Locked Cuffs X 4". (Exhibit 1, page 41). Appellant was put into a room where nurses put straps on him. (N.T. 63). Appellant was still convulsing and shaking. (N.T. 63).

Mother, who traveled with Appellant in the ambulance and remained at Appellant's bedside from his arrival at 2:34 p.m. until shortly before midnight, testified unpersuasively that she never witnessed him being combative, and that she thought the restraints had been used to prevent Appellant from falling out of the bed. (N.T. 63-64). However, an entry in the Reading Hospital Records noted at 2:40 p.m. described Appellant as "Combative. Refusing treatment. Locked cuffs x 4". (N.T. 64, Exhibit 1, page 1). The Reading Hospital Records also stated that Appellant's time to room was at 2:40 p.m., and that the patient refused to permit the taking of his vitals at 2:40 p.m. (Exhibit 1, page 1). Subsequently, vitals were reported at 4:40 p.m., 10:00 p.m. and 7:20 a.m., after Appellant had been sedated. (Exhibit 1, page 1). Mother testified that

---

[1] The evidence established that Mother signed several forms including the ones she refers to at N.T., 62-63 and N.T. 65; the Application for Involuntary Emergency Examination and Treatment (Exhibit 1, pages 119-120); an Authorized Representative form that is not dated (Exhibit 1, page 2); and the Instructions for Families of Patients Admitted To The In-Patient Psychiatric Unit on Nov. 1, 2004, (Exhibit 1, page 114).

3

Appellant kept saying that he did not need or want treatment, but she signed "the paper" without objection or denial of any of its contents because she "knew he needed to be seen". (N.T. 65). Mother did not mention the supplements Appellant had been taking to the health care providers at the hospital. (N.T. 77).

Mother also testified that from the time Appellant was admitted to Reading Hospital until she left sometime between 11:00 p.m. and midnight, she remained continuously with him and she does not remember observing a doctor examining Appellant in his room, nor does she remember Appellant ever being provided a copy of any forms. (N.T. 66-67). Appellant, who vaguely remembers some of the events of that day, does not specifically have a recollection of being examined by a doctor or being provided any forms. (N.T. 81-83). The Reading Hospital Medical Records Progress Notes indicate that that after receiving the medications prescribed by Dr Sigal, Appellant slept throughout the evening and the early morning. (Exhibit 1, page 66). Appellant and Mother also did not recall Appellant being advised of any other rights, such as the right to an attorney, an opportunity to submit evidence, and an opportunity to be heard before a Judge. (N.T. 67-68, 83-84).

Conversely, the Reading Hospital Medical Records include an Emergency Care Unit Medical Report signed by Dr. Adam Sigal on October 31, 2004. (N.T. 8, Exhibit 1, page 3). Dr. Sigal testified that although he had no independent memory of Appellant's commitment (N.T. 21), his standard routine would have been to write the time on the form at or around the time he went into the room to assess the patient. (N.T. 30). The time on the Report indicated 3:15 p.m. (Exhibit 1, page 3). From reviewing the report, Dr. Sigal testified that his assessment began at 3:15 p.m. (N.T. 36). Dr. Sigal also testified that because the time at the top of the report states 3:15 p.m., he probably completed his portion of the report over the next hour or two. (N.T. 8-9).

4

Dr. Sigal testified that he conducted the evaluation at 3:15 p.m., but that he was not sure how much was completed at that time. (N.T. 26) Dr. Sigal testified that he would not have filled all of the information on the form at one time, rather information was likely to have been added as it became available. (N.T. 32).

Following his examination of the Appellant at or about 3:15 p.m., Dr. Sigal ordered lab tests including blood work, urinalysis, and an image of the brain. (N.T. 33). According to his testimony, Dr. Sigal's customary practice in 2004 would have been to write the numbers into the report as he got the lab results back. (N.T. 33-34). Dr. Sigal then ordered Haladol, Ativan, oxygen saturation monitoring, a full set of vital signs, and a consult with a social worker. (N.T. 35). Haladol and Ativan are both medications to control psychosis. (N.T. 35). Dr. Sigal also testified that it was not their general practice to provide a patient with any forms. (N.T. 21-22).

Appellant was involuntarily committed under a 302 petition application. (Exhibit 1, pages 118-124). In Part I of the 302 application signed by Mother on October 31, 2004, it stated:

> "[Appellant] has experienced the loss of his girlfriend, graduated college, and had a job offer which overwhelmed him. E. S.started acting strange after the job offer on Wednesday and began to just lay on the floor. He hasn't been bathing and began to have delusional thoughts about electricity (which he believes he created), sex, and "coming back to life". His delusional beliefs are causing him to shut down and he is unable to currently function. E.S. stated that he has been experiencing auditory and visual hallucinations. He has delusional thoughts about controlling the weather and planets."

(Exhibit 1, page 119-120). Mother also checked the box that requested the County Administrator issue a warrant to take the patient to a facility for examination and treatment. (Exhibit 1, page 119-120).

Part IV of the 302 application ("The Patient's Rights") clearly stated that on October 31, 2004, Appellant had the rights described in Form MH 783-A explained to him, and that the

5

person explaining the rights believed that Appellant did not understand those rights. (Exhibit 1, Page 122).

Part VI of the 302 application ("Physician's Evaluation") stated that Appellant was "severely mentally disabled and in need of treatment." (Exhibit 1, page 124). The physician's findings were that Appellant was "floridly psychotic, rambling speech, delusional & hyperactive, unable to care for himself & exercise appropriate judgement to prevent injury". (Exhibit 1, page 124). It further indicated that Appellant required "hospitalization, evaluation & treatment". (Exhibit 1, page 124). This same part of the application, which was signed by emergency room physician Dr. Joanne Gordon, affirmed that Appellant arrived at the facility at 2:34 p.m. on October 31, 2004, but was not examined by Dr. Joanne Gordon until "0010" (12:10 a.m. on November 1, 2004), with the "delay due to pending medical clearance". (Exhibit 1, page 124). Part VI of the 302 application was signed by Dr. Gordon on November 1, 2004. (Exhibit 1, page 124).

Dr. Gordon's Affidavit stated that she has no independent recollection of Appellant or of the care and treatment he received at Reading Hospital in 2004 as related to this petition. (Exhibit 7, page 1). Dr. Gordon also confirmed that the results of examination section of Part VI of the 302 application were written in her handwriting, and that she signed the form. (Exhibit 7, pages 1-3). Dr. Gordon did not enter the times on Part VI, but expressed that she no reason to believe that the written times were inaccurate. (Exhibit 7, page 3). It was Dr. Gordon's custom and practice to evaluate a patient at bedside in the emergency department when completing the "Physician's Examination" portion of an Application for Involuntary Emergency Examination and Treatment. (Exhibit 7, page 3). It was not Dr. Gordon's custom or practice to personally give the patient forms at the time of examination. (Exhibit 7, page 3).

6

Appellant then spent approximately four (4) days at the hospital. (N.T. 84). After being released, Appellant continued to experience problems including trouble sleeping even after increasing his medication, and voluntarily went back to the hospital for three (3) days. (N.T. 85). Appellant has not been committed either voluntarily or involuntarily for mental health reasons since his release from the hospital in 2004. (N.T. 87).

## ISSUES

Appellant raises multiple issues in his five (5) page Concise Statement of Matters Complained of on Appeal, filed January 6, 2016.

1.      Whether the Court abused its discretion, committed error of law, or violated constitutional rights of Appellant by placing the burden of Petitioner/Appellant in relation to his challenges pursuance to Article 1, Section 1 of the Pennsylvania Constitution and 18 Pa.C.S. § 6111.1(g)(2), when as recently held by the Superior Court in *In re Vencil*, 120 A.3d 1028, 1034-35, 1037 (Pa. Super. 2015), *de novo* review is required, under a challenge pursuant to 18 Pa.C.S.. § 6111.1(g)(2), where the Respondents/Appellees bear the burden of establishing the sufficiency under a "clear and convincing" evidentiary standard of proof, as there is no statutory mechanism to challenge the sufficiency and validity of a 50 P.S. § 7302 commitment, unlike a 50 P.S. §7303 commitment.

2.   Whether the Court abused its discretion, committed error of law, or violated constitutional rights of Appellant by denying Petitioner/Appellant's challenge to the sufficiency of the commitment, pursuant to Article 1, Section 1 of the Pennsylvania Constitution and 18 Pa.C.S. § 6111.1(g)(2), when the record is devoid of any evidence establishing Respondents/Appellees compliance with all the statutory and regulatory requirements for an involuntary civil commitment, pursuant to the Mental Health and Procedures Act, 50 P.S. § 7101, *et seq.*, and its implementing regulations, 55 Pa.Code. 5100.1, *et seq.*, and where, to the contrary, the record establishes that:

A.   That Petitioner was never examined within two (2) hours of his arrival, as required by 50 P.S. §7302 and explicitly evidenced by the controlling document, Section VI of the 302 Petition

B.   That Petitioner/Appellant was never advised of his right to counsel, pursuant to 55 Pa.Code. §§ 5100.86(e), (j)(3);

C.   That Petitioner/Appellant was never provided counsel; and,

D.   That Petitioner/Appellant was never provided the form MH-782, MH-783A, or MH-783B, as required by 50 Pa.Code. §§ 5100.86(e), (g), (j), or anything substantially similar.

3.   Whether the Court abused its discretion, committed an error of law, or violated constitutional rights of Appellant by denying Petitioner/Appellant's request to vacate and/or expunge his mental health commitment contrary to established law including *Wolfe v. Beal*, 384 A.2d 1187 (Pa. 1978), *In re Vencil*, 120 A.3d 1028 (Pa. Super. 2015), *In re Ryan*, 784 A.2d 807 (Pa. Super. Ct. 2001), and *Benn v. Universal Health System,*

8

Inc., 371 F.3d 165 (3d Cir. 2004) when the record is devoid of any evidence, as set forth in Issue 2, *supra*, that Appellant was (1) examined within two hours of his arrival at the facility, (2) advised of his right to counsel, (3) was provided counsel, (4) was provided the requisite forms – MH-782, MH-783A, or MH-783B and where, in the absence of any such evidence, Petitioner/Appellant's commitment has tarnished his reputation and has putatively restricted his firearm's rights for the remainder of his natural life.

4.   Whether the Court abused its discretion, committed an error of law, or violated constitutional rights of Appellant by denying Petitioner/Appellant's constitutional Procedural and Substantive Due Process (state and federal) challenges when:

A.   The Mental Health and Procedures Act, 50 P.S. § 7101, *et seq.*, and its implementing regulations, 55 Pa.Code. 5100.1, *et seq.*, were not complied with, as set forth, *supra*;

B.   The Petitioner/Appellant was not informed of his right to an attorney;

C.   The Petitioner/Appellant was not provided an attorney;

D.   The Petitioner/Appellant was not provided an opportunity to offer witnesses or cross-examine witnesses;

E.   The Petitioner/Appellant was not provided an opportunity to submit and challenge evidence;

F.   The Petitioner/Appellant was not provided a neutral arbiter, as the examining physician is an agent and employee of the hospital with a pecuniary relationship;

G.   The Petitioner/Appellant's commitment was based solely on the signature of the examining physician, in the absence of all due process protections;

9

H.   The Petitioner/Appellant was never provided a *pre-* or *post-*deprivation hearing; and

I.   The Petitioner/Appellant is now putatively stripped of a constitutional right, in perpetuity, in the absence of due process, which other courts, e.g. *United States v. Rehlander*, 666 F.3d 45, 49 (1st Cir. 2012), have found is unconstitutional.

5.   Whether the Court abused its discretion, committed error of law, or violated constitutional rights of Appellant by denying Petitioner/Appellant's constitutional challenges pursuant to the Second Amendment of the United States Constitution and Article 1, Section 21 of the Pennsylvania Constitution, when he is putatively stripped, in perpetuity, of the ability to purchase, own, and possess firearms, even after the Court found that Petitioner/Appellant could possess a firearm without threat to himself or others.

6.   Whether the Court otherwise abused its discretion, committed an error of law, or violated the constitutional rights of Appellant in denying his request to vacate and/or expunge his mental health commitment.

Appellant's Concise Statement. (Jan. 6, 2016).

## DISCUSSION

"The clear and central intent of the General Assembly in enacting the Mental Health Procedures Act was to assure that those individuals who are severely mentally disabled will be

10

provided with the medical care they need, for their own health and safety, and for the safety of others." *In Re: R.F*, 914 A.2d 907, 915 (Pa. Super. 2006).

50 P.S. §7301(a) sets forth the conditions under which an individual is subject to involuntary emergency examination and treatment:

> Whenever a person is severely mentally ill and in need of immediate treatment, he may be made subject to involuntary emergency examination and treatment. A person is severely mentally disabled when, as a result of mental illness, his capacity to exercise self-control, judgment and discretion in the conduct of his affairs and social relations or to care for his own personal needs is so lessened that he poses a clear and present danger of harm to others or himself.

Under 50 P.S. §7302(b):

> A person taken to a facility shall be examined by a physician within two hours of arrival in order to determine if the person is severely disabled within the meaning of section 301 and in need of immediate treatment. If it is determined that the person is severely mentally disabled and in need of emergency treatment, treatment shall be begun immediately.

Expungement of records from an involuntary commitment is governed by18 Pa.C.S. §6111.1(g)(2):

> A person who is involuntarily committed pursuant to section 302 of the Mental Health Procedures Act may petition the court to review the sufficiency of the evidence upon which the commitment was based. If the court determines that the evidence upon which the involuntary commitment was based was insufficient, the court shall order that the record of the commitment submitted to the Pennsylvania State Police be expunged.

In relation to a challenge under Section 6111.1(g)(2), a *de novo* review is required. *In re Vencil*, 120 A.3d 1028, 1034 (Pa. Super. 2015).[2]

The standard of review is "clear and convincing" evidence. *Addington v. Texas*, 441 U.S. 418, 433 (1979). "Clear and convincing evidence is the highest burden in our civil law and

---

[2] At of the time of the filing of this Opinion the Supreme Court of Pennsylvania had granted the petition for allowance of appeal in the case of *In re Vencil*, 128 A.3d 1183 (Pa. 2015).

11

requires that the fact-finder be able to come to clear conviction, without hesitancy, of the truth of the precise fact in issue. *In re Vencil*, 120 A.3d 1028, 1037 (Pa. Super. 2015) (quoting *Weissberger v. Myers*, 90 A.3d 730, 735 (Pa. Super. 2014)).

This Court conducted a *de novo* review. Based upon review of the testimony, evidence, and briefs submitted by the parties, it is clear to this Court that the involuntary commitment of Appellant of October 31, 2004 – November 1, 2004 complied with the applicable laws. Appellant argues that Appellees bear the burden of establishing the sufficiency under a clear and convincing evidentiary standard of proof. 18 Pa. C.S. §6111.1(g)(2) does not place the burden of proof on Respondents. Appellant cites to *In re Vencil*, 120 A.3d 1028, 1034-35, 1037 (Pa. Super. 2015) to argue the contrary. *In re Vencil* notes that 18 Pa. C.S. §6111.1(g)(2) does not have a specific review procedure established but concluded that a *de novo* hearing and a clear and convincing evidence standard were both proper. *Id.* at 1034-1036. *In re Vencil* does not make it clear which party bears the burden of proving the sufficiency of the evidence upon which Appellant's involuntary commitment was based, but regardless, Reading Hospital and PSP have together clearly established the sufficiency of the evidence of the 302 commitment under a clear and convincing standard and Appellant has failed to show the evidence was insufficient.

Appellant argues that the involuntary commitment was insufficient because he was not evaluated by a physician within two (2) hours of his arrival at Reading Hospital as required under 50 P.S. §7302(b). However, the records reflect that upon Appellant's arrival at Reading Hospital at 2:34 p.m. his behavior was "combative" to such an extent that a restraint order was required. (Exhibit 1, pages 1, 41). The arrival time is corroborated by an Emergency Care Unit Report, which also indicates an arrival time of 2:34 p.m. (Exhibit 1, pages 1, 41). The records also reflect that Appellant refused to permit his vital signs to be taken at 2:40 p.m., and that he

12

was examined by Dr. Sigal at 3:15 p.m., well within two hours of his arrival at the hospital. (Exhibit 1, page 1). Appellant argues that because Dr. Sigal did not within two hours render a final determination as to whether or not Appellant required involuntary commitment, and because Gordon did not sign the Application for Emergency Involuntary Commitment until 12:10 a.m. on November 1, 2004, Appellant's commitment did not comply with 50 P.S. §7302(b).

Accordingly, this Court is tasked with interpreting the language and intent of 50 P.S. §7302(b), which requires examination by a physician within two hours of arrival in order to determine if an individual is severely mentally disabled and in need of immediate hospitalization and treatment. More specifically, this Court must determine whether Dr. Sigal's examination of Appellant at 3:15 p.m., and the subsequent monitoring of Appellant's medical condition, including administration of medication and recording vital signs at 4:40 p.m. and 10:00 p.m. so that a meaningful psychiatric assessment could be accomplished was sufficient to satisfy §7302(b), or whether the delay of almost ten hours before Dr. Gordon's determination and completion of the 302 Application invalidates the involuntary commitment and mandates expungement of the records as suggested by Appellant.

The language of 50 P.S. §7302(b) clearly requires that a physician conduct an examination within two hours, but it does not make it clear whether or not the physician's determination must be completed within the same two hour period. The plain language is as follows: "A person taken to a facility shall be examined by a physician within two hours of arrival in order to determine if the person is severely disabled within the meaning of section 301 and in need of immediate treatment." 50 P.S. §7302(b).

13

Appellant satisfied the requirements for being severely mentally disabled according to 50 P.S. §7301(a) as he was clearly a danger to himself and possibly to others. Appellant began behaving strangely throughout the middle of October, 2004, up to the day of his admission, started convulsing on his Mother's kitchen floor around noon on the day of his admission, and was still convulsing and shaking upon arriving at the Reading Hospital. (N.T. 59-62, 75, 81). The emergency room doctor, Dr. Sigal, signed the initial medical reports at 2:34 p.m. upon Appellant's arrival. (Exhibit 1, page 1). Appellant was assessed as exhibiting violent/aggressive behavior toward staff, other patients, or self; verbal or physical threats of harm to staff, other patients, or self; and risk of elopement in a restraint order signed by Dr. Sigal also at 2:34 p.m. (Exhibit 1, page 41). Appellant was also assessed as being combative and refusing treatment. (Exhibit 1, page 1). The Emergency Unit Report, together with Dr. Sigal's testimony established that an examination of Appellant by Dr. Sigal was initiated by 3:15 p.m. (Exhibit 1, page 3).

The evidence established that a course of assessment, observation, and treatment was immediately and continuously provided from the time of Appellant's arrival. At 3:15, less than one hour following Appellant's arrival, Dr. Sigal examined Appellant and subsequently ordered several tests, including urinalysis, blood work, a full set of vitals, oxygen saturation levels and a brain scan, and ordered Haladol and Ativan for the Appellant. (N.T. 35). Haladol and Ativan are both medications to control psychosis. (N.T. 35). The Reading Hospital records indicated that the Appellant continued to receive extensive observation and testing until Dr. Gordon examined the Appellant and signed the 302 Application at 12:10 a.m.

If 50 P.S. §7302(b) is to be read as to require a final determination within 2 (two) hours of a patient's arrival, medical care personnel will run the risk of either involuntarily committing

14

a patient whose mental distress is actually caused by an underlying physiological cause, or releasing a patient who is in need of involuntary mental health treatment.

The requirement that an individual with an apparent severe mental disability be examined by a physician within two (2) hours to assess that person's condition is a well-reasoned provision to protect patients with mental disabilities from harming themselves or others, as well as to provide a time frame in order to counterbalance the extraordinary deprivation of rights potentially afforded by Section 302. However, there is no rational basis for placing a two (2) hour stop-watch on physicians in the course of evaluating patients with extreme, even potentially life-threatening issues which may require more than two hours to ensure medical stability and determine the cause of mental disability.

Reading Hospital's brief cites to the state of Washington's involuntary commitment statute which offers helpful insight to how other courts have analyzed the issues raised by Appellant. Rev. Code Wash. (ARCW) §71.05.153(4) states:

> Within three hours after arrival, not counting time periods prior to medical clearance, the person must be examined by a mental health professional. Within twelve hours of notice of the need for evaluation, not counting time periods prior to medical clearance, the designated mental health professional must determine whether the individual meets detention criteria.

The Washington statute sensibly allows for extra time for medical evaluation and clearance before assessing a patient's mental health. Additionally, it draws a clear distinction between medical clearances and mental health examinations. Although Dr. Gordon did not sign and complete the 302 Application for almost ten (10) hours after Appellant arrived at Reading Hospital, Appellant began receiving immediate and necessary medical care from medical personnel, including Dr. Sigal, from the moment of his admission in furtherance of the goal of medical assessment and stabilization and psychiatric evaluation. Thus, this Court has determined

15

that the evidence clearly demonstrated that the Reading Hospital met the requirements of 50 P.S. §7302(b).

Appellant also raises the issue that he was never provided the form MH 782, MH 783-A, or MH 783-B, or anything substantially similar, as required by 50 Pa.Code. §§ 5100.86(e), (g), (j). In support of Appellant's position on this issue Appellant and Appellant's Mother both testified that they do not remember receiving any of these forms. This court does not find this testimony to be credible. Both Mother's testimony as well as the hospital records admitted into evidence as joint exhibits establish that Appellant's mental condition at the time of his presentation to the hospital on October 31, 2004 would not make him a reliable witness on events that occurred at that time. Additionally, contrary to this testimony, Part IV (The Patient's Rights) of the Application for Involuntary Emergency Treatment contains a clear affirmation that Appellant's rights were read to him, as described in Form MH 783-A, and that the Appellant did not understand those rights. (Exhibit 1, page 122). Form MH 783-A refers to an attached "Bill of Rights" form MH 782. (Exhibit 3, page 1, Exhibit 4, page 1). Mother also completed and signed the Application for Involuntary Emergency Examination and Treatment, which includes a request for the County Administrator to issue a warrant. (Exhibit 1, pages 119-120). Form MH 783-B is an "Explanation of Warrant." (Exhibit 5, page 1). Mother's completion of this paperwork is clear evidence that Mother received and, by signing, indicated that she understood the 302 Petition paperwork. Mother also signed several other forms including the ones she refers to at N.T., 62-63 and N.T. 65; an Authorized Representative form that is not dated (Exhibit 1, page 2); and the Instructions for Families of Patients Admitted To The In-Patient Psychiatric Unit on Nov. 1, 2004, (Exhibit 1, page 114).Though both Dr. Sigal and Dr. Gordon testified that they would not normally themselves hand forms to a patient, 55 Pa.Code. § 5100.86 only

16

requires that the examining physician makes sure that the patient received a copy of the forms, and the evidence demonstrates that the forms were provided.

Appellant further argues that he was never advised of his right to counsel, pursuant to 55 Pa.Code. §§ 5100.86(e), (j) (3), and was never provided counsel. Again, the evidence established that Appellant's rights as set forth in Form MH 783-A were read to him, but that he did not understand them. It is not surprising considering Appellant's condition at the time of his commitment as described by both Mother as well as hospital personnel and the attending physicians, that Appellant did not understand those rights. (Exhibit 1, page 122). Form MH 783-A refers to an attached "Bill of Rights" Form MH 782, which states a right to be "assisted by an advocate of your choice in the assertion of your rights and to see a lawyer in private at anytime." (Exhibit 3, page 1, and Exhibit 4, page 1). Mother also completed and signed the 302 Petition. (Exhibit 1, pages 119-120). There is no evidence that either Mother or Appellant requested counsel. The requirements of 55 Pa.Code. §§ 5100.86, do not mandate that an attorney be provided, just that notice of the right to counsel be provided.

Next, Appellant asserts numerous Constitutional claims, including that at the time of his commitment he was not provided an opportunity to offer witnesses or cross-examine witnesses; was not provided an opportunity to submit and challenge evidence; was not provided a neutral arbiter, as the examining physician is an agent and employee of the hospital with a pecuniary relationship; that Appellant's commitment was based solely on the signature of the examining physician, in an absence of all due process protections; that he was never provided a *pre-* or *post-*deprivation hearing; and that he is now putatively stripped of a constitutional right, in perpetuity, in the absence of due process, which, according to Appellant, other courts, e.g. *United States v. Rehlander*, 666 F.3d 45, 49 (1st Cir. 2012), have found is unconstitutional.

17

The basis asserted by Appellant for these constitutional claims is without merit. Under the law of this Commonwealth, anyone may challenge a commitment determination or file a petition for relief from the firearm disability resulting from a 302 commitment. 50 P.S. §7113 expressly grants the ability to file for a wide variety of relief. As counsel for the PSP points out in its brief, Appellant's argument is undermined by the very petition process he availed himself of in the instant case, i.e., petitions for relief pursuant to 18 Pa.C.S. § 6105 (f)(1) and 6111.1(g), known as the Uniform Firearms Act ("UFA").

The UFA confers upon courts in this Commonwealth authority to grant relief to applicants who are prohibited from possessing a firearm if it is determined that the applicant "may possess a firearm without risk to themselves or any other person". 18 Pa.C.S. § 6105(f)(1). In fact, this very relief was granted by this Court to the Appellant.

Even though Appellant specifically sought alternative state relief pursuant to 18 Pa.C.S. § 6105(f) in the event this Court did not vacate and expunge his 2004 involuntary commitment, Appellant now uses this Court's granting of §6105(f) state relief as an element of how this Court abused its discretion, committed error of law, and violated constitutional rights of Appellant by denying Petitioner/Appellant's constitutional challenges pursuant to the Second Amendment of the United States Constitution and Article 1, Section 21 of the Pennsylvania Constitution. (Appellant's Brief at 17-18, Sept. 8, 2015, Appellant's Concise Statement at paragraph 5, Jan. 6, 2016).

There is no authority for this Court to relieve Appellant from the federal firearms prohibition absent expungement and vacation of the commitment. The only basis for such relief requires a determination that the involuntary commitment was not based upon sufficient evidence and did not comply with 50 P.S. §7302. This Court is limited by the language and

18

requirements of 18 Pa.C.S.§ 6111.1(g), which govern judicial review of the sufficiency of the evidence for an involuntary commitment upon a request for expungement of the records from the commitment.

Likewise, Appellant's constitutional claims asserting that his rights have been violated by the Pennsylvania law which prohibits the possession of firearms by the mentally disabled are also without merit. It is well established that the right to bear arms, although constitutionally protected, is subject to reasonable regulation necessary to protect the public health safety and welfare. *Lehman v Pa. State Police*, 839 A.2d 265, 273 (Pa. 2003).

Based upon the foregoing this Court respectfully requests that the instant appeal be DENIED.

MADELYN S. FUDEMAN, J.

RECEIVED
PROTHONOTARY'S OFFICE
2016 MAR 23 P 2:45
BERKS COUNTY, PA
MARIANNE R. SUTTON
PROTHONOTARY

IN THE COURT OF COMMON PLEAS
FIRST JUDICIAL DISTRICT OF PENNSYLVANIA
CIVIL TRIAL DIVISION

| | |
|---|---|
| FREEDOM MEDICAL SUPPLY, INC. | : OCTOBER TERM 2013 |
| | : NO. 02268 |
| | : |
| PLAINTIFF | : 3420 EDA 2015 |
| | : |
| v. | : |
| | : |
| ALLSTATE FIRE AND CASUALTY | : |
| INSURANCE COMPANY | : |
| | : |
| DEFENDANT | : |

Powell, J.                                                    December 29, 2015

**OPINION**

### I.      PROCEDURAL HISTORY

Plaintiff brought this action which arose from Defendant's denial of reimbursement for certain medical equipment. On May 12, 2014, after an arbitration hearing, there was a finding for Plaintiff against the Defendant in the amount of $13,309.51. On June 2, 2014, Defendant appealed the arbitrators' award. On November 14, 2014, Plaintiff filed three Motions in Limine and on January 9, 2015, the Defendant filed its responses. The case was tried in front of this Court sitting without a jury on January 12, 2015 and January 13, 2015. On July 14, 2015, this Court found for the Defendant and against the Plaintiff. On October 22, 2015, after post-trial motions were denied, the Plaintiff filed a Notice of Appeal to the Superior Court of Pennsylvania. On November 6, 2015, the Plaintiff filed a timely Statement of Matters Complained of on Appeal pursuant Pa.R.A.P. 1925(b).

### II.     FACTUAL BACKGROUND

On June 2, 2011, Pablo Santos ("Mr. Santos") was injured in a car accident. At the time, Pablo Santos was the named insured on an automobile insurance policy issued by Allstate

Insurance Company ("Allstate"). On September 21, 2011, Mr. Santos saw Dr. Maurice Singer ("Dr. Singer") for his injuries. The next day, Freedom Medical Supply ("Freedom Medical") received a prescription from Dr. Singer on Freedom Medical's pre-made prescription form dated September 22, 2011. The prescription prescribed various durable medical equipment ("DME") for Mr. Santos including a lumbosacral support, a portable home whirlpool, electric moist heat pad, cervical pillow, and a portable muscle stimulator. On November 2, 2011, Freedom Medical logged a work order, signed by Mr. Santos, indicating delivery of all the prescribed DME to his address on 12003 Bustleton Avenue in Philadelphia. N.T. 1/12/2015 at 14, 16, 20, 23, 92; N.T. 1/13/2015 at 87.

On November 12, 2011, Freedom Medical submitted a bill to Allstate for reimbursement for the DME. On November 29, 2011, Allstate sent a letter to Freedom Medical denying its claim for reimbursement and indicated that the claim was under investigation. April 29, 2013, Allstate sent a letter to Freedom Medical again denying payment explaining that Mr. Santos was unable to confirm receipt of DME from the prescribing doctor. N.T. 1/12/2015 at 24, 36-37, 43.

April Mathis-Bush ("Mathis-Bush"), a claims service adjustor in the special investigation unit for Allstate, was assigned to investigate Freedom Medical's claim for reimbursement. On April 26, 2012, Mathis-Bush took a statement from an individual who claimed to be Mr. Santos. The individual presented a driver's license with the name Pablo Santos. The individual stated that he received the DME from Freedom Medical. Ms. Mathis-Bush did not find the individual to be credible and denied the claim for reimbursement. After suit had been filed, Ms. Mathis-Bush attended an arbitration hearing where Mr. Santos was present. Ms. Mathis-Bush confirmed that the individual who gave the statement in April, 2012 was not Mr. Santos. At trial, Ms. Mathis-

2

Bush also testified that the individual who gave the statement was not the same Mr. Santos who appeared at trial. N.T. 1/12/2015 at 107, 113-114, 120-121, 124; N.T. 1/13/2015 at 42-43, 57.

At trial, Mr. Santos testified that after he went to Dr. Singer he received some medical equipment, but he did not know on what date he received it. Mr. Santos described the equipment he received as "the thing for the chest, the bracelet that is hot, and something for the feet." About a week after he received the equipment, he gave it to his son because he didn't need the equipment. Mr. Santos was subpoenaed to bring the medical equipment he received to trial. Instead of bringing the equipment, Mr. Santos brought pictures of equipment taken by his son. Mr. Santos testified that he did not remember ever giving a statement about the equipment and indicated that the first time he ever met Ms. Mathis-Bush was at the arbitration hearing. N.T. 1/13/2015 at 11, 13, 15-23, 27, 29-30.

## III. DISCUSSION

Appellant raises the following issues:

1. The Trial Court erred in denying Freedom Medical's Motion in Limine to preclude any challenge to the amount of Freedom Medical's Charges for electrical muscle stimulator ("EMS") and whirlpool (EMS and whirlpool are hereinafter referred to collectively as "DME") and any evidence relating to the cost of Freedom Medical from DME.
2. The Trial Court erred in denying Freedom Medical's Motion in Limine to preclude any evidence or testimony relating to reasonableness and necessity of the DME provided by Freedom Medical to Pablo Santos ("Santos").
3. Allstate's responses to both [M]otions in [L]imine were untimely by over a month and should not have been considered by the Trial Court.
4. The Trial Court erred in allowing evidence relating to the cost of the DME to Freedom Medical, as well as permitting any challenge for the reasonableness and necessity of the DME since no peer review was performed by Allstate. See January 12, 2015 N.T. pp. 56-57.
5. The Trial Court erred in not permitting discovery of redacted claims notes prepared by Allstate, where no privilege log was

3

produced by Allstate, and the claims of Freedom Medical involved allegations of wanton conduct on the part of Allstate.

6. The Trial Court erred by not finding that the man who testified at the trial in January, 2015, who identified himself as Santos, was the same man who gave a recorded statement to April Mathis[-]Bush ("Bush") of Allstate on April 26, 2012. Specifically, the photograph on the driver's license presented to Bush on April 26, 2012 depicts the same person who testified at the time of arbitration and trial. This driver's license expired on March 22, 2013. This driver's license presented by Santos at trial marked at P-23 has the same address that he had been using (12003 Bustleton Avenue, Philadelphia, PA, where the DME was delivered). The photograph on the more recent license depicts the same person as the man who testified at trial, i.e. Santos.

7. Based upon a review of the evidentiary record as a whole. The Trial Court erred by failing to find that Jeffrey Bonn of Freedom Medical was a credible witness, that Bush was not a credible witness, and that Santos was credible insofar that DME was delivered to his house in November, 2011.

8. The Trial Court erred by not rejecting Allstate's stated position that Santos could not verify receipt of the DME was unreasonable and completely unsupported by any evidence as Santos testified at his April 26, 2012 recorded statement that he received the DME. Other than Bush's mere hunch that Santos did not receive the DME, there was overwhelming credible evidence presented at trial that the DME was delivered to Santos. Santos also signed a work order confirming receipt which was provided to Allstate prior to suit. Photographs of the DME were sent to Allstate. No additional investigation was performed by Allstate. Finally, Santos testified at the arbitration and at trial that he received the DME and later gave it to his son, Paul Santos.

9. The Trial Court erred in concluding that Santos was required to bring the DME to trial to demonstrate it had been delivered to him by Freedom Medical. Although the trial subpoena issued to Santos by counsel for Freedom Medical asked him to bring the DME, Santos no longer had the DME in his possession and was not required to retrieve it from his son to bring it to trial. See January 13, 2015 N.T. p. 82-83. No inference should have been drawn from Santos' not bringing the DME, especially when photographs of the DME taken by Santos' son where introduced into evidence.

10. The Trial Court erred in allowing Bush to testify regarding office notes from Maurice Singer, D.O. as it was beyond the scope of Bush's direct and cross examination. See January 13, 2015 N.T., pp. 88-97.

11. The Trial Court erred in failing to find that Allstate's failure to pay for the DME is limited to the one reason it asserted prior to suit for

4

denying Freedom Medical's claim, namely that the patient could not confirm receipt of the DME. See, Lyman v. State Farm Mut. Auto. Ins. Co., 2014 U.S. Dist. LEXIS 173345 (E.D. Pa. 2014) (Stengel, J.). (Shift in insurer's reasons for denying claim can constitute bad faith).

12. The Trial Court erred in failing to find that Allstate's failure to pay Freedom Medical's medical bills was unreasonable. The Trial Court should have found that Allstate was liable for damages under §1716 and 1798 of the Pennsylvania Financial Responsibility Motor Vehicle Act, including interest at 12% of the bills of $373.56 from December 15, 2011 to the present. This amount is $3.73 per month, for a total of $138.21 in interest as of the end of trial.

13. The Trial Court erred by failing to find that Allstate violated the Unfair Insurance Practices Act ("UIPA"), 40 Pa. C.S.A. §1171.1 and Unfair Claims Settlement Practices Regulations ("UCSPA"), 31 Pa. C. §146-6, 146.7 by not completing its investigation within a reasonable time and by not properly advising Freedom Medical of the results of the investigation.

14. The peer review process is the exclusive system for an insurer to challenge the reasonableness and necessity of medical treatment provided to an insured. Danton v. State Farm and Mut. Auto Insurance Company, 769 F. Supp. 174, 177 (E.D. Pa. 1991); Neun v. State Farm Insurance Company, 1996 U.S. Dist. LEXIS 5738 (E.D. Pa. 1996); (peer review is the exclusive system for an insurer to challenge the reasonableness and necessity of medical treatment to an insured. Williams v. State Farm Mut. Auto. Ins. Co., 763 F. Supp. 121, 124 (E.D. Pa. 1991).

15. Products, which are determined to be necessary by a licensed health care provider, are necessary medical treatment and rehabilitative services unless they shall have been found or determined to be unnecessary by a state-approved peer review organization. 75 Pa. C.S.A. §1702. Thus, duly presented medical care is presumptively reasonable and necessary unless peer review results is a contrary determination. Levine v. Travelers Property Cas. Ins. Co., 69 A.3d 671, 677 (Pa. Super. 2013).

16. The Trial Court erred in finding that the DME was not reasonable and necessary because Allstate failed to have a peer review performed.

17. Pursuant to the Unfair Claims Settlement Practices Regulations ("UCSPR"), "[e]very insurer shall complete investigation of the claim within 30 days after notification of the claim, unless the investigation cannot reasonably be completed within the time. If the investigation cannot be completed within 30 days, and every 45 days thereafter, the insurer shall provide the claimant with a

reasonable written explanation for the delay and state when a decision on the claim may be expected[."] 31 Pa. C. § 146.6.

18. Pursuant to the UCSPR, "[w]ithin 15 working days after receipt by the insurer of the properly executed proofs of loss, the first party claimant shall be advised of the acceptance of denial of the claim by the insurer. An insurer may not deny a claim on the grounds of a specific policy provision, condition or exclusion unless reference to the provision, condition or exclusion is included in the denial. The denial shall be given to the claimant in writing and the claim file of the insurer shall contain a copy of the denial". 31 Pa. C. § 146.7(a)(1).

19. "If the insurer needs more time to determine whether a first-party claim should be accepted or denied, it shall so notify the first party claimant within 15 working days after receipt of the proof of loss giving the reason why more time is needed. If the investigation remains incomplete, the insurer shall, within 30 days of the initial notification, and every 45 days thereafter, send to the claimant a letter setting forth the reasons why additional time is needed for investigation and state when a decision on the claim may be expected[."] UCSPR, 31 Pa. C. §164.7.

20. The Unfair Insurance Practices Act ("UIPA"), 40 Pa. C.S.A. §1171.1, specifically prohibits:

(i) Misrepresenting pertinent facts or policy or contract provisions relating to coverage at issue;

(ii) Failing to acknowledge and act promptly upon written or oral communications with respect to claims arising under insurance policies, ...

(iii) Refusing to pay claims without conducting a reasonable investigation based upon all available information;

[(iv)] Not attempting in good faith to effectuate prompt, fair and equitable settlements of claims in which the company's liability under the policy has become reasonable clear;

[(v)] Compelling persons to institute litigation to recover amounts due under an insurance policy...;

[(vi)] Failing to promptly provide a reasonable explanation of the basis in the insurance policy in relation to the facts of applicable law for denial of a claim...".

40 P.S. §1171.5(a)(10) (cited by Grigos v. Certain Underwriters at Lloyds, London, 2010 Phila. Ct. Com. Pl. LEXIS 383 (Phila. CCP 2010) (Bernstein, J.).

21. The Trial Court erred in failing to find that the conduct of Allstate was wanton because its statement to Freedom Medical on April 29, 2013 that Santos had not received the DME was misleading and an outright falsehood. Further, Allstate refused to respond to Freedom Medical's request for a copy of the statement of Santos. Allstate's goal has been to make it as costly as possible for medical providers

6

such as Freedom Medical to pursue meritorious claims by making misleading statements, filing repeated appeals, and presenting frivolous defenses that were never communicated to Freedom Medical prior to suit.

22. The Trial Court erred in failing to find that the failure of Allstate to pay Freedom Medical's invoice is conduct which is wanton, subjecting Allstate to treble damages pursuant 75 Pa. S.C.A. Section 1797(b)(4), as Allstate had no basis not to pay for the DME, conducted an incomplete investigation, failed to apprise Freedom Medical and Santos of the status of its investigation as required by the UIPA, and made false and misleading statements that the DME had not been received by Santos. Olsofsky, v. Progressive Ins. Co., 52 Pa. D&C 4th 449, 480 fn. 3 (Lack. Cty., 2001), 2001 Pa. Dist. & Cnty Dec. LEXIS 418. *See also*, 75 Pa. C.S. §1797(b)(1), for the purpose of PRO.

23. The Trial Court erred in failing to award reasonable counsel fees to Freedom Medical pursuant to 75 Pa. C.S.A. §1716, 1797 and 1798. Courts have made significant awards for legal fees on similar cases. Herd Chiropractic Clinic, P.C. v. State Farm Mutual Auto. Ins. Co., 29 A.3d 19 (Pa. Super. 2011) rev'd on other grounds 64 A.3d 1058 (Pa. 2013) (allowing legal fees of $27,047.50), Levine, supra (awarding $27,930.00 in legal fees).

24. The Trial Court erred in failing to find that the hourly rate of Dean E. Weisgold, Esquire, in the amount of $350.00 per hour is consistent with other practitioners with his level of experience (26 years) in this jurisdiction.

25. The Trial Court erred in failing to find that the legal fees and costs submitted by Freedom Medical ($27,079.10), were fair and reasonable and necessarily incurred in connection with this litigation, which began at the Philadelphia Municipal Court level in 2013, continued through arbitration and then concluded at a two day trial in 2015. See Exhibit P-9, and updated invoice.

Pre-Trial Matters

Freedom Medical's first three assignments of error challenge this Court's rulings on Motions in Limine. A trial court's decision to grant or deny a Motion in Limine is subject to an evidentiary abuse of discretion standard of review. *Catlin v. Hamburg*, 56 A.3d 914, 922 (Pa. Super. 2012) (*quoting Commonwealth v. Reese*, 31 A.3d 708, 715–716 (Pa. Super. 2011)). "An abuse of discretion may not be found merely because an appellate court might have reached a different conclusion, but requires a manifest unreasonableness, or partiality, prejudice, bias, or

ill-will, or such lack of support so as to be clearly erroneous." *Parr v. Ford Motor Co.*, 109 A.3d 682, 690-91 (Pa. Super. 2014) (*quoting Grady v. Frito-Lay, Inc.*, 839 A.2d 1038, 1046 (Pa. 2003); *Keystone Dedicated Logistics, LLC v. JGB Enterprises, Inc.*, 77 A.3d 1, 11 (Pa. Super. 2013). To constitute reversible error, an evidentiary ruling must not only be erroneous, but also harmful or prejudicial to the complaining party. *Parr*, 109 A.3d at 690-91 (citation omitted).

First, Freedom Medical claims that "[t]he Trial Court erred in denying Freedom Medical's Motion in Limine to preclude any challenge to the amount of Freedom Medical's charges for electrical muscle stimulator ("EMS") and whirlpool (EMS and whirlpool are hereinafter referred to collectively as "DME") and any evidence relating to the cost of Freedom Medical from DME." In its Motion, Freedom Medical argued that Allstate should be precluded from challenging the amount Freedom Medical charged for DMEs at trial because Allstate had not previously challenged the amount of the charges and that the amount Freedom Medical charges for DMEs are set statutorily.

Under the Pennsylvania Motor Vehicle Financial Responsibility Law ("MVFRL"), automobile insurance companies must provide insurance coverage "for reasonable and necessary medical treatment and rehabilitative services." 75 Pa. Stat. and Cons. Stat. Ann. § 1712(1). To be able to be reimbursed under the MVFRL, Freedom Medical is required to demonstrate the reasonableness of its services. *See Freedom Med. Supply, Inc. v. State Farm Fire & Cas. Co.*, 2014 WL 626430, at *7 (E.D. Pa. 2014) (*citing Allied Medical Assocs. v. State Farm Mut. Auto. Ins. Co.*, 2009 WL 1578603, at *5 (E.D. Pa. 2009) (finding an insurer only needs to pay providers for medical devices that are "reasonable and necessary").

Under the MVFRL, "[i]f a prevailing charge, fee schedule, recommended fee, inflation index charge or DRG payment has not been calculated under the Medicare program for a

8

particular treatment, accommodation, product or service, the amount of the payment may not exceed 80% of the provider's usual and customary charge. 75 Pa.C.S. § 1797(a). Neither the EMS nor the Whirlpool are included in the Medicare Fee Schedule and therefore are unlisted products subject to the 80% limit.

Contrary to Freedom Medical's assertion, the MVFRL does not proscribe a single way for providers to calculate their usual and customary charge. Usual and customary charge is defined as "[t]he charge most often made by providers of similar training, experience and licensure for a specific treatment, accommodation, product or service in the geographic area where the treatment, accommodation, product or service is provided." 31 Pa. Code § 69.3. "In calculating the usual and customary charge, an insurer *may* utilize the requested payment amount on the provider's bill for services or the data collected by the carrier or intermediaries to the extent that the data is made available. 31 Pa. Code § 69.43(c) (emphasis added). Here, the statute uses the permissive term "may" which indicates that it not only contemplates, but allows, other manners of calculating charges. *Commonwealth v. Baraniak*, 504 A.2d 931 (Pa. Super. 1986) ("While the word 'shall' might, in a proper setting, be interpreted as permissive, the word "may" can never be given the imperative meaning.") (citation omitted). Accordingly, the requested payment amount on the provider's bill is not the exclusive means of calculating the usual and customary charge, but merely an example of one way to calculate the usual and customary charge. Freedom Medical, to be able to recover, needed to present evidence of its usual and customary charge. This Court did not err in permitting the parties to present evidence of the usual and customary charges for DMEs, including the amount of Freedom Medical's bill and the cost of equipment to Freedom Medical.

Second, Freedom Medical claims "[t]he Trial Court erred in denying Freedom Medical's Motion in Limine to preclude any evidence or testimony relating to reasonableness and necessity of the DME provided by Freedom Medical to Pablo Santos ("Santos")." In its Motion, Freedom Medical argued that no evidence should be permitted regarding the reasonableness and necessity of the DME because there was no peer review. The MVFRL provides a mechanism by which an insurer may challenge the reasonableness and necessity of an insured's medical treatment. An insurer may submit an insured's medical bill to a peer review organization ("PRO") to confirm that such treatment is medically necessary. 75 Pa.C.S. § 1797(b)(1). However, an insurer is not required to engage in the PRO process, which is anticipated by the statute. If an insurer does not utilize the PRO process, an insured or a provider "may challenge before a court an insurer's refusal to pay for past or future medical treatment or rehabilitative services or merchandise." *Perkins v. State Farm Ins. Co.*, 589 F. Supp. 2d 559, 562-63 (M.D. Pa. 2008) (*quoting* 75 Pa.C.S. § 1797(b)(4)). There is no requirement that an insurer use the PRO process or challenge whether products are reasonable and necessary. It is the Plaintiff's burden to prove that medical supplies and charges are recoverable. This Court properly denied Freedom Medical's Motion in Limine.

Third, Freedom Medical asserts that "Allstate's responses to both Motions in Limine were untimely by over a month and should not have been considered by the Trial Court." Relative to a Motion's timeliness, we recognize that a trial court has the discretion to control its calendar, and this Court may interfere only when justice demands it. *Cheng v. Se. Pennsylvania Transp. Auth.*, 981 A.2d 371 (Pa. Cmwlth. 2009). On June 5, 2014, it was ordered that "all pre-trial and dispositive motions must be filed no later than October 6, 2014." Without requesting a continuance, Freedom Medical filed both of his Motions in Limine on November 14, 2014. Allstate responded on January 9, 2015. Freedom Medical's Motion in Limine were untimely and

10

in violation of the June 5, 2015 Order. This Court finds that Freedom Medical has waived any challenge to the timeliness of Allstate's response. In addition, Freedom Medical was not prejudiced by the timing of Allstate's response. This claim is meritless.

Next, Freedom Medical alleges that "the Trial Court erred in concluding that Santos was required to bring the DME to trial to demonstrate it had been delivered to him by Freedom Medical. Although the trial subpoena issued to Santos by counsel for Freedom Medical asked him to bring the DME, Santos no longer had the DME in his possession and was not required to retrieve it from his son to bring it to trial. See January 13, 2015 N.T. p. 82-83. No inference should have been drawn from Santos' not bringing the DME, especially when photographs of the DME taken by Santos' son where introduced into evidence."
Initially, this Court notes that this claim is waived as counsel failed to object to this evidence at trial. N.T. 1/13/2015 at 21. Issues not raised by timely objection at trial are waived for purposes of appeal. *See* Pa.R.A.P. 302; *Herd Chiropractic Clinic, P.C. v. State Farm Mut. Auto. Ins. Co.,* 29 A.3d 19, 22 (Pa. Super. 2011) rev'd, 64 A.3d 1058 (Pa. 2013) (*citing Dilliplaine v. Lehigh Valley Trust Co.,* 322 A.2d 114, 116–17 (Pa. 1974).

In the event that this issue is not waived, it is meritless. Freedom Medical incorrectly asserts that because Mr. Santos did not comply with the subpoena issued by Freedom Medical, this Court was precluded from considering this fact. Freedom Medical does not contend that the subpoena was not lawfully issued nor that Mr. Santos was under an obligation to bring the DME to trial. Mr. Santos testified regarding the subpoena and why he did not bring the DME to court. This Court considered the evidence presented. This Court properly permitted evidence that Mr. Santos failed to comply with the subpoena and produce the DME at trial.

11

Next, Freedom Medical claims "[t]he Trial Court erred in failing to find that Allstate's failure to pay for the DME is limited to the one reason it asserted prior to suit for denying Freedom Medical's claim, namely that the patient could not confirm receipt of the DME. See, Lyman v. State Farm Mut. Auto. Ins. Co., 2014 U.S. Dist. LEXIS 173345 (E.D. Pa. 2014) (Stengel, J.). (Shift in insurer's reasons for denying claim can constitute bad faith)."

Preliminary objections shall state specifically the grounds relied upon. All preliminary objections shall be raised at one time. They may be inconsistent. 231 Pa. Code § 3142(b). Causes of action and defenses may be pleaded in the alternative. Pa.R.C.P. No. 1020 (b). "A party pleading in the alternative cannot be required to elect *upon which theory or which claim or defense* he rests his case. To require him to make an election would defeat the purpose of permitting him to plead in the alternative." *Laughlin v. McConnel*, 191 A.2d 921, 924 (Pa. Super. 1963) (citation omitted).

Here, Allstate indicated the in its Explanation of Benefits that it denied Freedom Medical's claim because Mr. Santos could not confirm receipt of the DME. After Freedom Medical filed suit, Allstate raised the reasonableness and necessity of the DME as a New Matter. Defendants are permitted to present inconsistent defenses. Although Allstate only provided a single reason for denial of the claim in 2013 that does not mean that it is precluded from raising additional reasons at trial. This claim is meritless.

Trial Matters

Freedom Medical next argues that "[t]he Trial Court erred in not permitting discovery of redacted claims notes prepared by Allstate, where no privilege log was produced by Allstate, and the claims of Freedom Medical involved allegations of wanton conduct on the part of Allstate."

12

A party may obtain discovery regarding any matter, not privileged, which is relevant to the subject matter involved in the pending action. 231 Pa. Code § 4003.1. Pennsylvania has historically held that the burden of proof is upon the party asserting that disclosure of the information would not violate the attorney-client privilege. *Commonwealth v. Maguigan*, 511 A.2d 1327, 1334 (Pa. 1986). "In a civil matter counsel shall not be competent or permitted to testify to confidential communications made to him by his client, nor shall the client be compelled to disclose the same, unless in either case this privilege is waived upon the trial by the client." 42 Pa.C.S. § 5928. The attorney-client privilege exists to "foster a confidence between attorney and client that will lead to a trusting and open dialogue." *Gocial v. Indep. Blue Cross*, 827 A.2d 1216, 1222 (Pa. Super. 2003) (citation omitted). The attorney-client privilege applies only to confidential communications made by the client to the attorney in connection with providing legal services. *Id.*

At trial, after a request by the parties, this Court examined the redacted portions of Ms. Mathis-Bush's log *in camera*. This Court determined that the redactions were covered by attorney-client privilege and were not discoverable by Freedom Medical. N.T. 1/12/2015 at 126-132. Freedom Medical has not provided this Court with any information that would establish that the redacted portions of the log were not privileged.

Freedom Medical makes multiple assignments of error challenging evidentiary rulings by this Court. Questions concerning the admissibility of evidence are within "the sound discretion of the trial court, and its discretion will not be reversed absent a clear abuse of discretion." *Commonwealth v. Selenski*, 18 A.3d 1229, 1232 (Pa. Super. 2011). "An abuse of discretion is not merely an error of judgment, but is rather the overriding or misapplication of the law, or the exercise of judgment that is manifestly unreasonable, or the result of bias, prejudice, ill-will or

13

partiality, as shown by the evidence of record." *Commonwealth v. Thompson*, 106 A.3d 742, 754

(Pa. Super. 2014) (*quoting Commonwealth v. Harris*, 884 A.2d 920, 924 (Pa. Super. 2005)

*appeal denied*, 928 A.2d 1289 (Pa. 2007)).

Freedom Medical claims "[t]he Trial Court erred in allowing Bush to testify regarding

office notes from Maurice Singer, D.O. as it was beyond the scope of Bush's direct and cross

examination. See January 13, 2015 N.T., pp. 88-97."

Freedom Medical challenges the following testimony:

> MR. McNULTY: And during those -- those office notes, was Mr. Santos purportedly receiving electrical stimulation as a part of the treatment?
> MS. MATHIS-BUSH: Yes.
> MR. WEISGOLD: Objection. Beyond the scope of cross.
> THE COURT: No, I will allow it.
>
> ...
> MR. McNULTY: Before yesterday, had this document ever been submitted to Allstate?
> MS. MATHIS-BUSH: No.
> MR. WEISGOLD: Objection, Your Honor. It's beyond the scope of cross.
> THE COURT: No, I allow it.
> MS. MATHIS-BUSH: No.
> MR. McNULTY: Now after yesterday, or -- yeah, after yesterday's court session, did you look into whether a claim had ever been made for a May 15, 2011, accident?
> MR. WEISGOLD: Objection. Beyond the scope of cross. Way beyond.
> MR. McNULTY: I agree, but I would just ask for a little bit of leeway.
> THE COURT: I will allow it.
> MR. McNULTY: I forgot to ask it on direct.

N.T. 1/13/2015 at 89-90.

The scope of redirect examination is largely within the discretion of the trial court.

*Commonwealth v. Dreibelbis*, 426 A.2d 1111, 1117 (Pa. 1981) (citation omitted). Moreover,

when a party raises an issue on cross-examination, it will be no abuse of discretion for the court to permit re-direct on that issue in order to dispel any unfair inferences. *Id.*

On cross-examination, counsel for Freedom Medical questioned Ms. Mathis-Bush whether she had a practice of requesting notes from doctors who proscribe DME. N.T. 1/13/2015 at 61. He questioned her regarding the prescription written by Dr. Singer for Mr. Santos. *Id.* at 69-70. He further questioned Ms. Mathis-Bush about the date of Mr. Santos' visit to Dr. Singer and the date of the prescription. *Id.* at 73-74, 87-88. Here, counsel for Allstate's questions regarding the office notes, which corresponded to Mr. Santos' visit and prescription, were clearly in response to the questions asked by counsel for Freedom Medical during cross-examination.

The question regarding the 2011 claim was responsive to the challenges made by counsel for Freedom Medical about the completeness of Ms. Mathis-Bush's investigation. To the extent they went beyond the scope of cross-examination, counsel was permitted a brief and limited amount of questions that he omitted during direct-examination. A trial judge has wide discretion to vary the normal order of proof and may permit a party to bring out on re-direct examination relevant evidence which inadvertently the party failed to bring out on direct examination. *Commonwealth v. Brown*, 342 A.2d 84, 91 (Pa. 1975) (citation omitted). This Court was within its discretion.

Freedom Medical asserts that "[t]he Trial Court erred in allowing evidence relating to the cost of the DME to Freedom Medical, as well as permitting any challenge for the reasonableness and necessity of the DME since no peer review was performed by Allstate. See January 12, 2015 N.T. pp. 56-57."

As discussed *supra*, the MVFRL does not proscribe an exclusive manner for providers to calculate their usual and customary charge. "In calculating the usual and customary charge, an

15

insurer *may* utilize the requested payment amount on the provider's bill for services or the data collected by the carrier or intermediaries to the extent that the data is made available. 31 Pa. Code § 69.43(c) (emphasis added). Usual and customary charge is defined as "[t]he charge most often made by providers of similar training, experience and licensure for a specific treatment, accommodation, product or service in the geographic area where the treatment, accommodation, product or service is provided." 31 Pa. Code § 69.3.

Freedom Medical, to prevail on its claim, was required to establish its usual and customary charge. The defense was allowed to present evidence challenging Freedom Medical's usual and customary charge. The cost of a device to Freedom Medical is relevant to calculating its usual and customary charge. Accordingly, this evidence was admissible. Further, Freedom Medical again asserts that Allstate should have been precluded from challenging the evidence of the reasonableness and necessity of the DME. Although Allstate denied the claim for a specific reason, this does not preclude Allstate from defending itself in court and challenging the reliability of the evidence presented by Freedom Medical.

Freedom Medical makes multiple claims of error challenging this Court's factual findings. Freedom Medical claims that:

   a. Based upon a review of the evidentiary record as a whole. The Trial Court erred by failing to find that Jeffrey Bonn of Freedom Medical was a credible witness, that Bush was not a credible witness, and that Santos was credible insofar that DME was delivered to his house in November, 2011.
   b. The Trial Court erred by not finding that the man who testified at the trial in January, 2015, who identified himself as Santos, was the same man who gave a recorded statement to April Mathis Bush ("Bush") of Allstate on April 26, 2012. Specifically, the photograph on the driver's license presented to Bush on April 26, 2012 depicts the same person who testified at the time of arbitration and trial. This driver's license expired on March 22, 2013. This driver's license presented by Santos at trial marked at P-23 has the same address that he had been using (12003 Bustleton

16

Avenue, Philadelphia, PA, where the DME was delivered). The photograph on the more recent license depicts the same person as the man who testified at trial, i.e. Santos.

c. The Trial Court erred by not rejecting Allstate's stated position that Santos could not verify receipt of the DME was unreasonable and completely unsupported by any evidence as Santos testified at his April 26, 2012 recorded statement that he received the DME. Other than Bush's mere hunch that Santos did not receive the DME, there was overwhelming credible evidence presented at trial that the DME was delivered to Santos. Santos also signed a work order confirming receipt which was provided to Allstate prior to suit. Photographs of the DME were sent to Allstate. No additional investigation was performed by Allstate. Finally, Santos testified at the arbitration and at trial that he received the DME and later gave it to his son, Paul Santos.

It is well settled that:

> [The fact-finder] is entitled to believe all, part, or none of the evidence presented. *Rafter v. Raymark Industries, Inc.*, 429 Pa. Super. 360, 632 A.2d 897 (1993). A [fact-finder] can believe any part of a witness' testimony that they choose, and may disregard any portion of the testimony that they disbelieve. *Mitzelfelt v. Kamrin*, 526 Pa. 54, 584 A.2d 888 (1990). Credibility determinations are for the [fact-finder]. *Sundlun v. Shoemaker*, 421 Pa. Super. 353, 617 A.2d 1330 (1992).

*Randt v. Abex Corp.*, 234, 671 A.2d 228, 233 (Pa. Super. 1996). "It is the function of the [fact-finder] to evaluate evidence adduced at trial to reach a determination as to the facts, and where the verdict is based on substantial, if conflicting evidence, it is conclusive on appeal."

*Commonwealth v. Reynolds*, 835 A.2d 720, 726 (Pa. Super. 2003).

This Court credited the majority of the testimony of both Mr. Bonn and Ms. Mathis-Bush. Both witnesses detailed the actions they took in their professional capacity. However, neither Mr. Bonn nor Ms. Mathis-Bush could testify to the events of November 2, 2011 and whether or not Mr. Santos received the DME.

This Court did not credit the testimony of Mr. Santos that he received the DME. It was clear from the testimony that Mr. Santos was not in possession of the DME at the time of trial.

17

N.T. 1/13/2015 at 15. Although Mr. Santos asserted that he received some medical equipment, he could not accurately describe the items that he received. At trial, Mr. Santos described the items he received as "the thing for the chest, the bracelet that is hot, and something for the feet. *Id.* at 13. At the arbitration hearing, Mr. Santos described the items he received as an electrical thing to give shocks to the heart and over here for the neck and an electrical brace and a thing to put your feet in the water. *Id.* at 18. According to Ms. Mathis-Bush, this description does not describe the equipment Mr. Santos was billed for. N.T. 1/13/2015 at 58. Mr. Santos did not know the date he received the equipment. *Id.* at 13. Mr. Santos was unable to produce the DME when ordered to by the court, even though they were allegedly in the possession of his son. *Id.* at 21-22.

Mr. Santos' credibility was damaged by the fact that another person posed as Mr. Santos and gave a statement to Ms. Mathis-Bush. Mr. Santos indicated that he did not give a statement to someone after the accident. *Id.* at 27. Mr. Santos admitted that the first time he met Ms. Mathis-Bush was at the arbitration hearing. *Id.* at 29-30.

Besides Mr. Santos' inaccurate descriptions and Mr. Bonn's incredible assertions that Mr. Santos received all of the equipment billed for, there was very little corroborating evidence. Although there was a work order with a signature purportedly from Mr. Santos, this Court does not find it persuasive. Mr. Santos admitted to signing papers he did not understand. *Id.* at 27. Additionally, there was evidence that another individual had posed as Mr. Santos. There was nothing in Dr. Singer's notes that indicated that any DME had been discussed with Mr. Santos. *Id.* at 57. Finally, although Freedom Medical presented pictures of DME, there was no credible evidence supporting that the equipment in the photos was ever provided to Mr. Santos.

Accordingly, the weight of the evidence supported the conclusion that Mr. Santos did not receive the DME. These claims are meritless.

Freedom Medical next alleges that "[t]he trial court erred in finding that the DME was not reasonable and necessary because Allstate failed to have a peer review performed." Freedom Medical is mistaken. This Court did not conclude that the DME was not reasonable and necessary. This Court found that Mr. Santos did not receive the DME. Accordingly, no finding as to the reasonableness or necessity of the equipment was required.

Freedom Medical claims that "[t]he Trial Court erred in failing to find that Allstate's failure to pay Freedom Medical's medical bills was unreasonable. The Trial Court should have found that Allstate was liable for damages under § 1716 and 1798 of the Pennsylvania Financial Responsibility Motor Vehicle Act, including interest at 12% of the bills of $373.56 from December 15, 2011 to the present. This amount is $3.73 per month, for a total of $138.21 in interest as of the end of trial."

Benefits are overdue if not paid within 30 days after the insurer receives reasonable proof of the amount of the benefits. 75 Pa.C.S. § 1716. Freedom Medical did not establish that it provided DME to Mr. Santos; and thus, did not provide reasonable proof of the amount of benefits. Therefore, Allstate was under no obligation to pay Freedom Medical.

Freedom Medical makes multiple allegations of error complaining of Allstate's handling of its investigation and denial of the claim. Freedom Medical alleges that:

a. The Trial Court erred by failing to find that Allstate violated the Unfair Insurance Practices Act ("UIPA"), 40 Pa. C.S.A. §1171.1 and Unfair Claims Settlement Practices Regulations ("UCSPA"), 31 Pa. C. §146-6, 146.7 by not completing its investigation within a reasonable time and by not properly advising Freedom Medical of the results of the investigation.

b. The Trial Court erred in failing to find that the conduct of Allstate was wanton because its statement to Freedom Medical on April 29,

19

2013 that Santos had not received the DME was misleading and an outright falsehood. Further, Allstate refused to respond to Freedom Medical's request for a copy of the statement of Santos. Allstate's goal has been to make it as costly as possible for medical providers such as Freedom Medical to pursue meritorious claims by making misleading statements, filing repeated appeals, and presenting frivolous defenses that were never communicated to Freedom Medical Prior to suit.

c. The Trial Court erred in failing to find that the failure of Allstate to pay Freedom Medical's invoice is conduct which is wanton, subjecting Allstate to treble damages pursuant 75 Pa. S.C.A. Section 1797(b)(4), as Allstate had no basis not to pay for the DME, conducted an incomplete investigation, failed to apprise Freedom Medical and Santos of the status of its investigation as required by the UIPA, and made false and misleading statements that the DME had not been received by Santos. Olsofsky, v. Progressive Ins. Co., F, 480 fn. 3 (Lack. Cty., 2001), 2001 Pa. Dist. & Cnty Dec. LEXIS 418. *See also,* 75 Pa. C.S. §1797(b)(1), for the purpose of PRO.

Initially, this Court notes that the Unfair Insurance Practices Act states "[a]ny of the following acts *if committed or performed with such frequency as to indicate a business practice* shall constitute unfair claim settlement or compromise practices." 40 Pa.C.S.A. § 1171.5(a)(10) (emphasis added). Freedom Medical has not alleged that the complained of actions by Allstate have been committed with such frequency as to constitute a business practice. This claim is meritless.

"Every insurer shall complete investigation of a claim within 30 days after notification of claim, unless the investigation cannot reasonably be completed within the time. If the investigation cannot be completed within 30 days, and every 45 days thereafter, the insurer shall provide the claimant with a reasonable written explanation for the delay and state when a decision on the claim may be expected." 31 Pa. Code § 146.6. "[I]f the investigation remains incomplete, the insurer shall, 30 days from the date of the initial notification and every 45 days

20

thereafter, send to the claimant a letter setting forth the reasons additional time is needed for investigation and state when a decision on the claim may be expected." 31 Pa. Code § 146.7.

On November 12, 2011, Freedom Medical submitted an invoice to Allstate. N.T. 1/12/2015 at 24. On November 29, 2011, Freedom Medical received a letter from Allstate denying reimbursement because the claim was under investigation. *Id.* at 36-37. On April 29, 2013, Allstate sent a letter to Freedom Medical indicating payment was denied. Allstate explained that Mr. Santos was unable to confirm receipt of the DME from the prescribing doctor. *Id.* at 43. Although Allstate notified Freedom Medical that it was investigating the claim within thirty days of initial notification of the claim, it failed to provide updates to Freedom Medical thereafter.

"Delay is a relevant factor in determining whether bad faith has occurred, but a long period of time between demand and settlement does not, on its own, necessarily constitute bad faith .... [I]f delay is attributable to the need to investigate further or even to simple negligence, no bad faith has occurred." *Rowe v. Nationwide Ins. Co.*, 6 F. Supp. 3d 621, 634 (W.D. Pa. 2014) (*quoting Kosierowski v. Allstate Ins. Co.*, 51 F.Supp.2d 583, 588–89 (E.D. Pa. 1999) *aff'd*, 234 F.3d 1265 (3d Cir. 2000) (holding that the insurer's failure to send letters every forty-five days explaining why the claim had not yet been evaluated did not create a material issue of fact regarding bad faith)).

Here, Allstate was in regular communication with Mr. Santos and his attorney during the investigation. Freedom Medical was aware that Allstate was completing its investigation. Freedom Medical has not demonstrated that it was prejudiced by Allstate's failure to send regular updates. Although, Allstate was negligent in failing to inform Freedom Medical of the

21

progress of the investigation in the precise manner mandated by the regulations, such negligence does not constitute bad faith in this case.

Freedom Medical asserts that this Court erred in failing to find that Allstate's conduct was wanton and failing to award damages for such conduct. "A provider of medical treatment or rehabilitative services or merchandise or an insured may challenge before a court an insurer's refusal to pay for past or future medical treatment or rehabilitative services or merchandise, the reasonableness or necessity of which the insurer has not challenged before a PRO. Conduct considered to be wanton shall be subject to a payment of treble damages to the injured party." 75 Pa.C.S. § 1797(4). As this Court has discussed *supra*, Allstate was justified in denying reimbursement because Mr. Santos could not establish receipt of the DME. Allstate was under no obligation to undergo the peer review process or pay Freedom Medical's bill. Allstate acted in a reasonable manner investigating the claim. Allstate clearly did not act in a wanton manner in denying a meritless claim. *Morrison v. Mountain Laurel Assurance Co.*, 748 A.2d 689, 691 (Pa. Super. 2000) (noting where a plaintiff cannot demonstrate that denial of coverage was unreasonable, bad faith cannot be established).

Post-Trial Matters

Finally, Freedom Medical submits multiple claims of error alleging this Court erred in denying attorney's fees:

    a. The Trial Court erred in failing to award reasonable counsel fees to Freedom Medical pursuant to 75 Pa. C.S.A. §1716, 1797 and 1798. Courts have made significant awards for legal fees on similar cases. Herd Chiropractic Clinic, P.C. v. State Farm Mutual Auto. Ins. Co., 29 A.3d 19 (Pa. Super. 2011) rev'd on other grounds 64 A.3d 1058 (Pa. 2013) (allowing legal fees of $27,047.50), Levine, supra (awarding $27,930.00 in legal fees).

    b. The Trial Court erred in failing to find that the hourly rate of Dean E. Weisgold, Esquire, in the amount of $350.00 per hour is

consistent with other practitioners with his level of experience (26 years) in this jurisdiction."

c. The Trial Court erred in failing to find that the legal fees and costs submitted by Freedom Medical ($27,079.10), were fair and reasonable and necessarily incurred in connection with this litigation, which began at the Philadelphia Municipal Court level in 2013, continued through arbitration and then concluded at a two day trial in 2015. See Exhibit P-9, and updated invoice.

Counsel for Freedom Medical argues that the following sections entitle him to attorney fees. "In the event the insurer *is found to have acted in an unreasonable manner* in refusing to pay the benefits when due, the insurer shall pay, in addition to the benefits owed and the interest thereon, a reasonable attorney fee based upon actual time expended." 75 Pa.C.S. § 1716 (emphasis added). "If, pursuant to paragraph (4), a court determines that medical treatment or rehabilitative services or merchandise were medically necessary, the insurer must pay to the provider the outstanding amount plus interest at 12%, as well as the costs of the challenge and all attorney fees." 75 Pa.C.S. § 1797(6). "In the event an insurer is found to have acted with no reasonable foundation in refusing to pay the benefits enumerated in subsection (a) when due, the insurer shall pay, in addition to the benefits owed and the interest thereon, a reasonable attorney fee based upon actual time expended." 75 Pa.C.S. § 1798(b).

However, counsel for Freedom Medical ignores that "[i]f it is determined by a PRO or court that a provider has provided unnecessary medical treatment or rehabilitative services or merchandise or that future provision of such treatment, services or merchandise will be unnecessary, or both, the provider *may not collect payment* for the medically unnecessary treatment, services or merchandise." 75 Pa.C.S. § 1797(7) (emphasis added). The default rule in Pennsylvania is that litigants bear responsibility for their own attorneys' fees in the absence of express statutory authorization for fee awards, contractual fee-shifting, or some other recognized

23

exception. *Herd Chiropractic Clinic, P.C. v. State Farm Mut. Auto. Ins. Co.*, 64 A.3d 1058, 1062-63 (Pa. 2013) (citation omitted).

Freedom Medical did not establish that it provided DME to Mr. Santos. Freedom Medical did not provide any merchandise to Mr. Santos, regardless of whether it was medically necessary or not. Thus, Allstate acted in a reasonable manner in denying its claim for reimbursement. Accordingly, counsel for Freedom Medical was not entitled to any attorney fees.

Finally, this Court notes that paragraphs 14, 15, 17, 18, 19, and 20 of Freedom Medical's Concise Statement of Matters Complained of on Appeal do not allege any allegations of error. This Court will not address them.

## I.  CONCLUSION

For the foregoing reasons, the decision of this Court, granting judgment in favor of the Defendant, Allstate, and against Plaintiff, Freedom Medical, should be affirmed.

BY THE COURT,

_____
KENNETH J. POWELL, JR., J.

24